### BOARD OF TRUSTEES OF THE TOWN OF HUNTINGTON *v.* LOWNDES.

(*Circuit Court, E. D. New York.*  November 19, 1889.)

**1. WORDS AND PHRASES—"HAVEN" OR "HARBOR."**
  A body of water need not be land-locked in order to be a "haven" or "harbor."

**2. PUBLIC LANDS—STATE TITLE—HUNTINGTON BAY.**
  Huntington bay, a body of water lying between Lloyd's neck and Eaton's neck, on the north side of Long island, in the state of New York, is a "haven" or "harbor," within the meaning of the language contained in the colonial patents of 1666, 1688, and 1694, granting to the town of Huntington title to all lands south of Long Island sound, between certain fixed east and west bounds. including "all havens, harbors, waters," etc.

**3. SAME—TITLE TO THE SOIL.**
  The title to the soil under said bay passed to the trustees of the town by virtue of said patents.

**4. OYSTER-BEDS—TITLE BY USER—NON-RESIDENTS.**
  Whatever rights, if any, a citizen of the state of New York might have obtained under the common law by long possession and user of an oyster-bed in any of the common or public lands of the state, no such rights could be obtained by a non-resident of the state, nor retained by a former resident after he had removed from the state.

**5. SAME.**
  The defendant, then a citizen of New York, having had possession of an oyster-bed in Huntington bay, in the state of New York, from 1867 to 1872, claiming that said oyster-bed was upon the common lands of the state, but claiming no title to the soil in himself, then removed to and thereafter resided in the state of Connecticut, but still continued to occupy the oyster-bed. *Held,* that when he removed from the state of New York, and gave up his citizenship, he at the same time yielded up whatever equitable right of ownership he had in the premises, if any, and his use and occupation thereafter was that of a trespasser only, which could not ripen by any lapse of time into either a title in fee or a right to continued occupation thereof.

(*Syllabus by the Court.*)

At Law.  Action in ejectment.

The plaintiffs, the board of trustees of the town of Huntington, in the county of Suffolk, in the state of New York, sued the defendant, Theodore S. Lowndes, in the supreme court of the state of New York, under section 1502 of the Code of Civil Procedure, to recover possession of their lands under water in Huntington bay, claiming title thereto under three colonial patents or grants, to-wit, the Nicolls patent, of November 30, 1666, the Dongan patent, of August 2, 1688, and the Fletcher patent, of October 5, 1694. The cause was removed to the United States circuit court on application of the defendant by reason of his being a non-resident of the state of New York. The defendant, Lowndes, in 1867, being then a resident of New York, staked out and planted oysters on 130 acres of land under water in Huntington bay, upon which there were then growing no natural oysters, and continued thereafter, from time to time, to plant seed oysters thereon, which matured in from three to five

years, and which he removed at maturity, and continued so to occupy said lands for oyster cultivation up to the time of the trial of this action, claiming at the time of his original entry the right to such occupation as a citizen of the state of New York, and claiming that the title to said lands was in the state of New York, and not in the town of Huntington. The defendant asserted no title to the fee of these lands in himself. In 1872, he removed to the state of Connecticut, and thereafter continued to be a non-resident of the state of New York. He continued planting and taking up oysters from said bay after he had become a non-resident, changing the crop thereon every three or five years. He obtained no written lease, authority, title, or franchise from the state, or from the town. Prior to the commencement of this action, he was notified by the plaintiffs to remove his oysters from these grounds, and refused. In 1888, and prior to the commencement of this action, the legislature of the state of New York ceded to the plaintiffs all the right, title, and interest of the people of the state of New York, if any, of, in, and to the lands under water in Huntington bay, for the purpose of oyster cultivation, subject, however, to the legal rights, if any, of persons having oysters planted there. Laws N. Y. 1888, c. 279. While asserting no title to the fee of the said lands under water in himself, the defendant claimed that by reason of his occupation thereof since 1867 he had acquired a legal right, by prescription or otherwise, to hold said lands, and to continue to occupy the same for the purpose of oyster cultivation, irrespective of the ownership of the soil. The colonial patents granted to certain trustees therein named, for themselves and their associates, the freeholders and inhabitants of the said town, their heirs, successors, and assigns, forever, all lands within the limits and bounds therein expressed; that is to say, "from a certain river or creek on the west, commonly called by the Indians by the name of 'Neckoquatok,' and by the English the 'Cold Spring,' to stretch eastward to Nesaquack river; on the north to be bounded by the sound betwixt Long Island and the main, and on the south by the sea;" "as also all havens, harbors, creeks, quarries, woodland, meadows, pastures, marshes, waters, lakes, fishing, hawking, hunting and fowling, and all other profits, commodities, emoluments, and hereditaments to the said land and premises, within said limits and bounds belonging, or in any wise appertaining," etc. These patents or grants were confirmed by the colonial legislature and the first constitution of the state of New York. The plaintiffs were the successors of the trustees named in said patents. Laws N. Y. 1872, c. 492. The trustees of the town of Huntington always claimed under their patents title to the lands under the waters south of Long Island sound, between the east and west bounds mentioned in said patents, and had exercised acts of ownership thereon by making leases to various individuals for purposes of oyster cultivation, dock leases, gravel leases, etc., in Huntington bay. At their town-meetings the freeholders and inhabitants of the town had annually passed resolutions forbidding non-residents of the town from taking clams, oysters, or other shell-fish from any of the waters of said town under a penalty, as they were authorized to do under the

laws of the state of New York.   In 1737 the colonial legislature of the colony of New York passed an act forbidding non-residents of the colony from gathering or taking oysters or shell-fish from any of the waters within the said colony.   Liv. & S. Laws N. Y. c. 672, p. 265.   The board of supervisors of the county of Suffolk also enacted a law, in 1875, forbidding non-residents of the county of Suffolk from planting or taking oysters from any of the waters within their jurisdiction, under authority of the laws of the state of New York conferring such powers upon boards of supervisors.   Laws N. Y. 1849, c. 194; *Smith* v. *Levinus*, 8 N. Y. 472.   In 1880 the legislature of the state of New York passed an act making it a misdemeanor for any non-resident of the state of New York to plant oysters in any of the waters of the state of New York without the consent of the owners of the same.   Pen. Code N. Y. § 441.   In 1887 the legislature of the state of New York also passed an act creating a state board of fish commissioners, which act also forbids the leasing of lands under water, within their jurisdiction, to non-residents of the state. Laws N. Y. 1887, c. 584.   The states of New York and Connecticut, by commissioners duly appointed on the part of each of the said states, under and in pursuance of laws passed by the legislatures of each of said states in 1879 and 1880, (Laws N. Y. 1880, c. 213,) made an agreement to settle the question of the boundaries between said states through Long Island sound, which agreement was duly executed by the commissioners of said states respectively, and confirmed by the legislatures of said states respectively.   This agreement, and the boundary line established in pursuance thereof, was ratified, approved, and consented to by the congress of the United States, February 26, 1881, (21 U. S. St. at Large, p. 351,) entitled "An act concerning settlement of boundary lines between New York and Connecticut."   Huntington bay is situated south of said boundary line between the said states, as so established, and south of Long Island sound, and is wholly within the territorial limits of the state of New York.   By acts of the legislature of each of said states passed thereafter, and before the commencement of this action, the lines of the respective towns and counties bordering upon Long Island sound in each of said states were extended to said boundary line so established.   Laws N. Y. 1881, c. 695.

*Henry C. Platt,* counsel for plaintiffs, at the close of the testimony moved for a direction of a verdict for the plaintiffs, and cited:

Authority for towns making regulations for their common lands, Act. N. Y. March 7, 1788, c. 64, §§ 15, 16, (2 Jones & V. Laws N. Y. 337;) same continued, and now in force, 2 Rev. St. 881, or 2 Rev. St. pt. 1, c. 11, tit. 2, art. 1, § 10; such records evidence, 2 Rev. St. 885-900.   Laws ratifying colonial grants to the town, Act Colonial Legislature, passed May 6, 1691; Liv. & S. Laws, c. 2, p. 2; first Const. N. Y. (April 20, 1777,) § 35, continues in force existing colonial laws; section 36 ratifies the colonial grants; section 1, 1 Jones & V. Laws N. Y. 12; or, same, 1 Rev. St. N. Y. 44; second Const. N. Y. (Nov. 10, 1821,) art. 7; 1 Rev. St. §§ 13, 14, p. 58; third and existing Const. N. Y., (Nov. 3, 1846,) and amendments, article 1, §§ 17, 18; 1 Rev. St. N. Y. 64, 84.   Laws excluding non-residents of colony and state, etc.,

from taking or planting oysters within its jurisdiction, Act Colonial Assem. Dec. 6, 1737; Liv. & S. Laws, c. 672, p. 265; resolution board supervisors Suffolk county, passed 1875, pursuant to Laws 1849, c. 194, § 4, subd. 13, ( 2 Rev. St. 1025;) and also Laws 1875, c. 482, § 1, subd. 16, (2 Rev. St. 1039,) which laws were passed pursuant to the present constitution of the state of New York, article 3, § 23; Pen. Code, (1880,) § 441: oyster franchise act, excluding non-residents, Laws 1887, c. 584, §§ 4–9. As to validity, construction, and extent of patents, *Brookhaven* v. *Strong*, 60 N. Y. 56; *Robins* v. *Ackerly*, 91 N. Y. 98; *Hand* v. *Newton*, 92 N. Y. 88; *Roe* v. *Strong*, 107 N. Y. 358, 14 N. E. Rep. 294. The defendant by his occupation obtained no title to the soil, nor any right to the continued possession thereof, after notice to remove therefrom, as against the plaintiffs, the holder of the legal title, but at most only acquired property in his oysters. *Fleet* v. *Hegeman*, 14 Wend. 42; *McCarty* v. *Holman*, 22 Hun, 53; *Sutter* v. *Van Derveer*, 47 Hun, 366. The legal title to the land in dispute being in the town of Huntington, under its ancient grants, the occupation and use thereof by the defendant must be considered to have been permissive, and in subordination to the legal title, as he claimed no title thereto in himself at the time of taking possession, nor at any other time. His possession was not of that adverse character that would ripen into a title by adverse possession to the soil, nor one that would create an easement, or a right of continuous possession, as against the owner of the soil. *Ogden* v. *Jennings*, 66 Barb. 308; *Colvin* v. *Burnet*, 17 Wend. 564; *Howard* v. *Howard*, 17 Barb. 663–667; *Livingston* v. *Iron Co.*, 9 Wend. 511; *Harvey* v. *Tyler*, 2 Wall. 328; *Smith* v. *Burtis*, 9 Johns. 180; *Jackson* v. *Johnson*, 5 Cow. 74; *Jackson* v. *Frost*, Id. 346; *Hoyt* v. *Dillon*, 19 Barb. 651; *Robinson* v. *Kime*, 70 N. Y. 152; *Bliss* v. *Johnson*, 94 N. Y. 235; *Thompson* v. *Burhans*, 79 N. Y. 99; *Higinbotham* v. *Stoddard*, 72 N. Y. 94, 9 Hun, 1. He obtained no easement, and had no estate to which an easement or profit *a prendre* could attach. *Ward* v. *Warren*, 82 N. Y. 265; *Nicholls* v. *Wentworth*, 100 N. Y. 455, 3 N. E. Rep. 482; *Roe* v. *Strong*, 107 N. Y. 358, 14 N. E. Rep. 294; Washb. Easem. 565–570; *Cobb* v. *Davenport*, 33 N. J. Law, 223; *McFarlin* v. *Essex Co.*, 10 Cush. 310; *Pierce* v. *Keator*, 70 N. Y. 420; *Huntington* v. *Asher*, 96 N. Y. 604; *Hill* v. *Lord*, 48 Me. 99; *Huff* v. *McCauley*, 53 Pa. St. 209. If no title under patents, then the plaintiffs had title under the grant from the state in 1888. The state had power to make such a grant. *Post* v. *Kreischer*, 32 Hun, 49, 103 N. Y. 110, 8 N. E. Rep. 365, 1 N. Y. Crim. R. 501; *McCready* v. *Virginia*, 94 U. S. 391. The defendant had acquired no legal rights in the premises at the time of the grant from the state, except the right to a reasonable time to remove his personal property therefrom, to-wit, his oysters, after notice from the owner of the soil. His occupation thereof had not been continuous: and, if he had acquired any common-law right to the occupation or possession of the premises for purposes of oyster planting as a citizen of the state of New York, he abandoned and lost such right when he became a non-resident of the state, in 1872. *McCready* v. *Virginia*, *supra*. The language of the patents was broad enough to include the premises in question, which are two miles south of Long Island sound, and within Huntington bay proper. The body of water south of the headlands of Eaton's neck and Lloyd's neck has always been known as "Huntington Bay," as distinguished from "Long Island Sound." All the lands under water and above water south of the Sound passed to the town under their patents. These premises are concededly within the east and west bounds of the patents. It is immaterial whether such lands lie under the waters of a land-locked harbor or an arm of the sea, if they are included within the bounds of the patent. *Brookhaven* v. *Strong*, *supra*. Lands under water may be recovered by ejectment. *People* v. *Mauran*, 5 Denio, 389; *Railroad Co.* v. *Valentine*, 19 Barb. 484.

*N. S. Ackerly*, *C. R. Street*, and *H. C. Platt*, for plaintiffs.

*Martin J. Keogh*, counsel for the defendant, contending that the defendant had a right to the continued possession of the premises in question, which he had acquired under the common law, cited the following cases: *Lowndes* v. *Dickerson*, 34 Barb. 586; *Martin* v. *Waddell*, 16 Pet. 410; *Corfield* v. *Coryell*, 4 Wash. C. C. 379; *Decker* v. *Fisher*, 4 Barb. 592.

LACOMBE, J., (*orally.*)   As to the construction of these ancient charters, touching the character of the estate they convey, this court will follow the rulings of the courts of this state.

The next question is as to the extent, territorially, of these patents. Ordinarily, a bay is spoken of as a distinct body of water, distinct from the sea, or from the arm of the sea, out of which it opens.   Sounds and arms of the sea are said to flow into and out of the bays, and bays to open into sounds.   In this particular case, there seems to be a measure of doubt as to the location of the line of the Sound, in the light cast upon it by some of these deeds which have been introduced.   The boundary of Eaton's neck, as granted at about the time of this patent, makes it seem uncertain as to exactly where the Sound ended.   These points were before Judge CULLEN, I see, in the case of *Ackerly* v. *Godfrey*, and he there sustained the plaintiff's view as to the boundary by the Sound.   In this particular case, however, I do not think it necessary to determine precisely what would be the north and south limits of this patent, if we only had the words "by the Sound" and "by the sea."   The use of the words "harbor" and "haven" seems to be sufficient to carry this particular body of water.   I do not know that there is any rule of law, or any principle or practice of common speech, which requires that a harbor shall be land-locked, or that a haven shall be absolutely safe from every wind that blows.   Grants from the sovereign, as well as acts of legislatures or documents generally, are to be interpreted by giving to the words which they contain, in the absence of anything to indicate a contrary meaning, the plain, ordinary meaning which they have in the educated speech of people by whom the language is employed. This particular body of water geographically indicates that it may be used as a haven or harbor, and the geographical appearance of the land is to be taken largely into consideration here; for these grants were made at a time when, I infer, the north shore of Long Island was not used to any particular extent for the purposes of navigation, it not being much settled at that time.   The geographical appearance, then, of this body of water, bounded on three sides by land, would indicate its appropriateness as a harbor or haven, and experience—as to which we have been advised through the testimony of the witnesses, leaving out of view any points of dispute between them—goes to show that it has been used as a harbor or haven.   It is not a perfectly safe harbor, nor an absolutely secure haven.   It is a place which, when the wind is blowing, or is threatening to blow, from a northerly point, it is desirable, perhaps, to leave; but when the wind comes from the east or south or west it is a place which,

in those circumstances, will afford a reasonably secure place of harbor, and a reasonable haven for ships. It seems that under the language of these grants, then, the title to the land in controversy was given to the town of Huntington.

It only remains to consider the effect of defendant's use and occupation of the particular part of that land which he has used and occupied. With regard to this use and occupation, it is to be noted that it is not in character continuous. When he originally began to use the land, to occupy it by putting his personal property upon it, he claimed that he had a species of title to the land as a citizen of the state of New York; that he, in common with all his fellow-citizens, had an equitable title to those lands, the legal title being in the state, in trust for the common purposes of its citizens. Under the law of the state,—I do not mean the statute law,—under the law of the state, if the title were still in the state, he could, (in that territory as to which he, with others, had a common title,) by the performance of certain acts thereon, segregate, as it were, a portion of such territory, so that, as to that, it might be said that his occupation and use of the portion thus segregated might become exclusive. Now, even conceding that the legal title was still in the state, and that this right which he obtained by actual occupation and use might be considered an equitable property right which he had there, his occupation in assertion of such property right continued only for six years. In 1872 he moved out of the state of New York,—ceased to be a citizen of the state. When I was considering this case yesterday, I inclined to the opinion that the rights to the common lands held by the states were rights which, in the absence of anything to the contrary, were to be participated in by all the inhabitants of the Union. Since the argument yesterday, and after examining the subject more carefully, and giving it further thought, I am inclined to change that opinion. When the individual state succeeded to the sovereignty of England, and took the title to the property which theretofore the crown of England had held, each state held that property, that is, such of it as was held in common, in trust for its own citizens; and no property right whatever in the land so held by one state belonged to the citizens of an adjoining state. That being so, when the defendant removed from the state, and gave up his citizenship, he at the same time yielded up whatever equitable right of ownership he had in these premises. From and after that date, whatever occupation and use he had was the occupation and use of a trespasser only, which could not ripen by any lapse of time—certainly, could not ripen by the lapse of sixteen years—into either a title in fee or a right to continue the use. In this view which I take of the character of the occupation, I am inclined to the opinion that the defendant has not succeeded in establishing his right to continue to occupy this land as he has occupied it in the past. I shall therefore direct a verdict for the plaintiffs.

Verdict accordingly.